**MASON CITY TENT & AWNING COMPANY, Waterloo Tent & Awning Company, Mankato Tent & Awning Company, Plaintiffs,**

v.

**Clyde E. CLAPPER, Robert D. McCarthy, Comfort Equipment Company, Burch Manufacturing Company, Inc., Defendants.**

No. 9178.

United States District Court
W. D. Missouri, W. D.

Aug. 24, 1956.

Swecker & Mathis, Washington, D. C., Margolin & Kirwan, Kansas City, Mo., for plaintiffs.

Thomas E. Scofield, Kansas City, Mo., for Clyde E. Clapper.

Madden & Burke, Kansas City, Mo., for Robt. D. McCarthy and Comfort Equipment Co.

Rudolph L. Lowell, Des Moines, Iowa, for Burch Mfg. Co., Inc.

RIDGE, District Judge.

Stripped of superfluous verbiage and collateral issues, this private Sherman Act, 15 U.S.C.A. § 1 et seq., case finds its existence in the following factual background: Mason City Tent & Awning Company and Mankato Tent and Awning Company are respectively corporations existing under the laws of the State of Iowa and State of Minnesota. Waterloo Tent & Awning Company was incorporated under the laws of the State of Iowa. Prior to the bringing of this action, it appears that corporation was dissolved on November 30, 1950. Charles W. Gasswint is and was the owner of all the capital stock of said corporations and at all times herein mentioned was the chief managing officer thereof. The business of said corporations, prior to 1948, was generally restricted to the manufacture, processing and sale of awnings, tents, tarpaulins and other canvas goods. In 1948 said corporations, under the circumstances hereinafter related, entered the field of manufacturing tractor covers (designed to deflect the heat of tractors around the operator thereof) in addition to other articles produced by them.

In 1945 the defendant Clyde E. Clapper, and Lee Flora, separately, claimed invention to a tractor cover for deflecting heat around the operator of a tractor, and each filed separate applications for a patent thereon. In 1946 Michael A. Halligan made claim to a like invention and filed an application for a patent

thereon. During the pendency of said three patent applications, the Patent Office declared interference between all three of them; and also declared separate interference between the Flora and Halligan applications. While his application for patent was pending, Clapper granted a license to Bearing Distributors Company to manufacture and sell his invention. Later, that Company's corporate name was changed to Comfort Equipment Company, a defendant herein, and hereinafter will be referred to as "Bearing" or "Comfort". Flora likewise granted a license to Cab-Ette Company, of Danville, Illinois, hereinafter referred to as "Cab-Ette"; and, Halligan granted a license to Fort Dodge Tent and Awning Company, which later changed its name to Burch Manufacturing Company, Inc., a defendant herein and hereinafter referred to as "Fort Dodge" or "Burch". After licenses were granted to the above corporations, Comfort began manufacturing and selling tractor covers in May, 1945; and, Cab-Ette and Burch began like operations in 1946.

In April of 1948, after declaration of the aforesaid interferences, representatives of the above-named three licensees, the three above-named inventors, and their respective attorneys, met in Chicago, Illinois, in an effort to settle their differences with respect to priority of invention. At the outset of said meeting it was agreed by all parties present that each of the licensees under the then pending applications for patent would have a right to a license under each patent application then pending, and thereafter if letters patent were granted thereon; * * * this before the date of invention was disclosed at that meeting by the three inventors, or their respective representatives there present. Thereafter, at said meeting, evidence of priority of invention was adduced and discussed by the parties, as was the question of royalties to be paid by the prospective licensees. At the conclusion of the meeting, though specific agreement was not reached thereon, it was generally understood that Clapper had rightful claim

to priority of invention to the basic unit of a tractor heat deflector; that Flora had priority of invention as to the part thereof which surrounded the operator; and that if Halligan had any claim respecting such an invention it was minimum. The parties being unable to settle at that meeting the question of priority and amount of royalty to be paid by the proposed licensees, the meeting was concluded with agreement that another meeting be held by the interested parties, or their representatives, to formulate specific agreements regarding the above-mentioned matters. Later, two other such meetings were held in St. Louis, Missouri, at which the interested parties, or their representative, attended. At these meetings in St. Louis, Missouri, various topics, such as priority of invention, amount of royalty to be paid, the establishment of a "Litigation Fund", costs of manufacture, and the selling price per unit of tractor cabs, and other related subjects were discussed. From the conferences had at said meetings, and correspondence later passing between the interested parties, a final meeting was agreed to be held at Des Moines, Iowa, on August 3–4, 1948. At that meeting, "Priority Award Agreements" were consummated by the three inventors whereby Clapper was awarded priority of invention on the counts involved in the three-way interference proceedings, and Flora was awarded priority of invention on the counts involved in the two-way interference. Thereafter, on November 2, 1948, Clapper was duly granted letters patent. Flora was granted letters patent on February 15, 1949. Halligan received no letters patent on his application.

At the meeting in Des Moines, Iowa, the interested parties also agreed upon the terms of and duly executed a "License Agreement" respecting the subject matter of the then pending patent applications. By said license agreement, Clapper's and Flora's priority of invention was recognized. Cab-Ette, Fort Dodge and Bearing were each granted a separate license to manufacture and sell heating units embodying the Flora

and Clapper inventions, subject to the following conditions, so far as here pertinent: (1) that the licensees manufacture such heater units "at their respective addresses and in no other place or places, except upon written consent" of the owner of the patents; (2) that the licensees pay Clapper $1.00 "as a royalty fee on each and every unit sold and shipped by them" and pay a proportionate royalty on parts; (3) that Flora receive a 24¢ royalty fee on each and every unit sold by licensees, and also a "proportionate royalty" on parts, the same as Clapper; (4) that if any party to the agreement made, or became the owner of, any "improvements in said heating units" then Cab-Ette, Ford Dodge and Bearing could manufacture and sell the improvements without paying any further royalty, except as set forth in paragraph 13 of the agreement; (5) that Flora and Clapper would not grant any license under any patent that may be issued to them respectively, "or any other patents that might fall within (the) license agreement, without first obtaining the written consent thereto of the remaining parties to (the) agreement," and each of the licensees agreed not to grant any sub-licenses, or any license on "any other patent that might fall within (the) license agreement, without * * the consent thereto of the remaining parties"; (6) Flora and Halligan agreed to "file applications for Canadian patents on the subject matter of their respective U. S. patent applications" and Clapper and Flora granted licensees the right "to manufacture and sell heating units under their respective Canadian patent applications "then on file or to be filed"; (7) that if any patent was issued on the "Halligan application" or "any improvement made by Halligan relative to the subject matter of his application" then Bearing and Cab-Ette would have an option "to take a license under such patent" and pay royalties therefor "on equal terms with Fort Dodge"; (8) Sections 13, 14 and 15 of said license agreement read as follows: .

"13. In the event any of the claims included in patents that may be issued on said Flora, Clapper or Halligan application, or any patents issued covering any improvements thereon, are infringed or in the event any party to this agreement is sued for infringement for the manufacture of heating units under said patents, then any party to this agreement having knowledge of such infringement or any party to this agreement who is sued for infringement shall send written notice thereof to the remaining parties and within a reasonable time thereafter, not to exceed twenty days, all of the parties hereto agree to discuss said infringements for the purpose of arriving at a mutually agreed upon procedure for their disposition.

"14. To prosecute infringers and defend against infringement, the parties hereto agree to set up a litigation fund of $8,000.00 in the following manner: coincident with the execution of this agreement, Clapper shall pay into the said fund $3,000.00 and Cab-Ette, Fort Dodge and Bearing the sums of $1,000.00 each; that Cab-Ette, Fort Dodge and Bearing shall pay into said fund the additional sum of 5¢ on each heating unit sold by them, respectively, from and after the 1st day of August, 1948, and said Clapper shall pay into said fund the sum of 5¢ for each $1.00 royalty by him received from and after the 1st day of August, 1948, until the fund amounts to $8,000.00. That if at any time during the life of this agreement said fund shall be depleted to the sum of $6,000.00, then in any such event, the said parties hereto shall again contribute to said fund at the rate of 5¢ per unit as hereinabove in this paragraph provided, until said fund shall again amount to the sum of $8,000.00. The monies to be paid into said fund as above provided shall be paid to Clapper, who shall deposit

and hold the same in trust in the Commerce Trust Company of Kansas City, Missouri, for the prosecution of infringers and the defending against infringement of any patents because of the manufacture, by Cab-Ette, Fort Dodge, or Bearing of heating units under the above recited patent applications, or patents issuing therefor, or any future patents that may fall within the terms of this agreement. That said funds are to be used for the prosecution of infringements of any of said patents only upon the approval of a majority of the parties to this agreement. That said fund shall also be used to defray the expense that may be necessarily incurred in the investigation of claimed infringements and the necessary correspondence, negotiations and the giving of legal notice of infringement to infringers. That in the event any of the parties to this agreement shall claim an infringement materially affecting their business and shall have given notice thereof to the other parties hereto as provided in paragraph numbered 13 hereof, and a majority of the parties hereto agree that such claimed infringement should be prosecuted, then such prosecution shall be instituted within ninety days, but if a majority of the parties hereto shall fail to give their approval to the prosecution of such an infringement within a period of ninety days after the giving of such notice, then in that event, such party hereto claiming to be materially affected as aforesaid shall have the right and privilege at its own expense to prosecute such infringement without any claim to any of the monies in the said fund in this paragraph provided for, unless such prosecution shall have been finally resolved in favor of the complainant, in which event said complainant shall be entitled to be reimbursed from said fund for their expense incurred in the prosecution of such infringement. That in the event a majority of the parties agree to the prosecution of any infringement, or to undertake the defense of any claimed infringement by any of the parties hereto, that in any such event, the owner of the patent being infringed shall, and with the aid and advice of the remaining parties hereto if he so chooses, select and engage required counsel. That Clapper shall render unto Cab-Ette, Fort Dodge, and Bearing upon request an itemized statement of all sums, if any, withdrawn from said fund accompanied by a copy of the bank statement thereof. That the liability of Flora, Clapper, and Halligen (sic.) to prosecute infringements or to defend against infringements shall be limited to the monies in said fund in this numbered paragraph provided for. Upon the termination of this agreement by expiration of the patents issued to Flora and Clapper on U. S. Applications 617,049 and 583,345, respectively, or otherwise, or by the mutual consent of the parties, said fund shall be liquidated by dividing among the parties the monies in said fund in proportion to the amounts paid in by said parties as herein provided for.

"15. That in the event a patent shall be issued for improvements upon said heating units to persons other than parties to this agreement, then in such event, it is agreed that the parties hereto shall call a meeting and act as a unit in the negotiation for the use of such improvement, if desired, so as to make the same mutually available and on the same terms to all parties to this agreement, but that if the majority of the parties to the agreement determine not to contract for such improvement, then the parties to this agreement are privileged to contract therefor individually or collectively."
(9) said agreement was "based not only on the patents to be issued on said Clapper or Flora application which (were) the "subject matter of (said) agreement, but

also upon those issued upon any renewals, continuations, divisions of, or substitutes for, said applications, and also on any reissues or extensions of said patent or patents"; and (10) that unless otherwise terminated, the licenses granted were to "extend to the latest expiration date of any patent issued on said Clapper and Flora applications."

Under the original license that Comfort had from Clapper; Cab-Ette had from Flora; and Burch had from Halligan; and the license agreement executed by defendants on August 4, 1948, the defendant licensees, Comfort, Cab-Ette and Burch, built up substantial businesses, each doing several million dollars of business, in interstate commerce, manufacturing and selling tractor heating units during the time referred to herein. Each had numerous distributors in this country and Canada. Their collective sales value of tractor covers ranged from $200,000 to over a million dollars a year. Royalties paid to the patentees above named, collectively, has amounted to over five hundred thousand dollars.

Adhering to the agreement of August 4, 1948, the defendant licensees and Clapper set up a "Litigation Fund" as therein provided, for the purpose of defraying the expense of investigating and prosecuting infringers and defending against infringements of the Clapper and Flora patents. Said fund continued in existence from 1948 and the parties proceeded to use and control the same jointly as provided in said license agreement until on or about May 6, 1953. On that date the "Litigation Fund" was disbursed to Clapper and Flora, proportionately and the agreement of August 4, 1948 was terminated by the execution of a "Termination Agreement" which mainly resulted from a civil anti-trust action instituted against the defendants and Flora and Cab-Ette by the United States, in this District Court. Thereafter, Comfort, Cab-Ette and Burch received and conducted their business operations in tractor covers under separate, non-exclusive licenses from said patentees, and any and all interim effects of the agreement of

August 4, 1948 thereafter ceased to exist.

Prior to 1948, Burch sold tractor covers manufactured by it to the D & D Company of Fort Dodge, Iowa, a sales organization. The relations between D & D Company and Burch terminated in May of 1948. D & D Company thereafter made arrangements with Gasswint whereby the plaintiff companies undertook to manufacture tractor covers for D & D Company. D & D thereafter proceeded to sell "Work Warmers" manufactured by the plaintiffs, until June 17, 1949, when the D & D Company was declared an involuntary bankrupt. When plaintiffs began the manufacture of tractor covers for D & D Company, the officers of D & D, and the plaintiffs, had personal knowledge of the then pending patent applications of Clapper, Flora and Halligan. As a consequence, plaintiffs required and received from D & D Company indemnity against the results of any violations of such patent rights resulting from their manufacturing tractor covers for D & D. Before starting such manufacturing, plaintiffs were delivered by D & D Company, tractor covers which D & D and plaintiffs knew had been manufactured by Comfort or Burch as licensees of Clapper and Flora under patent applications then pending.

In the bankruptcy proceeding of D & D Company, the plaintiffs filed a claim as a creditor, based upon the agreements they had with D & D Company above mentioned. The substance of said claims was for loss sustained under an executory contract to manufacture and sell tractor covers to D & D. There is no evidence in the instant record that any alleged Sherman Act violations by defendants had any impact on the plaintiffs' business at that time, or caused the termination of the contract plaintiffs had with D & D. In other words, D & D's bankruptcy was brought about and proceeded from other causes than the giving of notices of infringement served by Clapper on plaintiffs and D & D. Therefore, plaintiffs' claimed damages herein, for defendants' alleged violations of the Sherman Act,

began to accrue sometime after June 17, 1949.

After D & D Company was adjudged bankrupt, plaintiffs continued to manufacture tractor heater covers and attempted to set up their own sales outlets. Such endeavors were not very successful. On August 3, 1949, plaintiffs entered into an agreement with Larsen and Swanstrom Company, another sales agency, to act as their sales representative in selling tractor covers manufactured by them. Thereafter, plaintiffs began advertising "Work Warmers" and that agency effected all sales of tractor covers manufactured by plaintiff up and until November 1, 1950. Before the last-mentioned agreement was entered into, Larsen and Swanstrom had personal knowledge that plaintiffs and D & D had been served with notices of infringement of Clapper's letters patent.

It was on November 24, 1948 that Clapper, through his counsel, Mr. Fred Roberts, caused notice to be served on D & D Company, of that Company's infringement of his letters patent. As a consequence thereof, D & D Company on December 3, 1948 filed a declaratory judgment suit in this District Court against Clapper, seeking a declaration that Clapper's patent was invalid. In that action Clapper counterclaimed against D & D Company for infringement. Said suit was never tried, because of the bankruptcy of D & D Company, and refusal of the trustee in bankruptcy to continue with the prosecution thereof. It was ultimately dismissed by this Court. plaintiffs, and Larsen and Swanstrom, had full knowledge of the pendency of the above declaratory judgment action, and status thereof from time to time, before the same was dismissed.

On January 4, 1949, Clapper, through counsel, served notice of infringement of his letters patent on plaintiffs. Notice of infringement of the Clapper patent was later in that year served on Larsen and Swanstrom, because of their promotion and sale of tractor covers for plaintiffs. In October, 1949, the first of a number of letters was sent by Roberts to the jobbers of plaintiffs, established through Larsen and Swanstrom, to sell plaintiffs' tractor warmers, informing said jobbers that the tractor covers manufactured by plaintiffs were infringements of Clapper's letters patent, and sale thereof by such jobbers constituted contributory infringement which subjected said jobbers to infringement action by said patentee. Whether the manufacture and sale of tractor warmers by plaintiffs was a profitable business enterprise during the above period of time is not established by the instant record, probably because of the limited issue now before the Court. It suffices to say, however, that some jobbers did cease selling tractor warmers manufactured by the plaintiffs as a consequence of such infringement notice and that sales thereof to the public were thereby directly curtailed and limited; although there is other evidence that the sale of plaintiffs' "Work Warmers" was retarded and limited because of poor manufacturing, and inefficiency in the packaging thereof by the plaintiffs. Plaintiffs herein do not contend that they were innocent infringers of the letters patent here involved, and they could not successfully do so under the evidence.

During all of the times herein mentioned, Clapper was represented by Mr. Fred M. Roberts, an Attorney, with offices in Kansas City, Missouri. After consummation of the license agreement of August 3, 1948, and establishment of the "Litigation Fund" provided for therein, Roberts, under instructions from Clapper and with the full knowledge and understanding of the other parties to the agreement of August 3, 1948, caused notices of infringement to be sent to D & D Company, to the plaintiffs, to Larsen and Swanstrom, and to all the known jobbers selling tractor warmers manufactured by plaintiffs. Knowledge of those and other claimed infringements came to Roberts from defendant licensees, from Clapper, Cab-Ette and Flora, and various other sources. When knowledge of a claimed infringement was made known to Roberts, he investigated the

same and caused infringement notices to be served on the alleged infringers. Copies of said notices were sent to Clapper, Flora, and to said licensees, or they were otherwise generally informed by Roberts of the giving of said notices of infringements. Clapper and Roberts considered the former obligated under Section 13 of the agreement of August 3, 1948, to give notice and take action against claimed infringements of Clapper's letters patent within ninety days after notice thereof was received from licensees, or from any other source, and generally did so by serving notices of infringement. Clapper expended $15,288.-24 from the "Litigation Fund" above mentioned, with the approval of Flora and the licensees, to defray the costs incurred in the giving of infringement notices and the prosecution of the infringement actions, including the one hereinafter referred to, instituted against the plaintiffs.

In January, 1950, after a second notice of infringement was served on plaintiffs by Roberts, several conferences resulted between Roberts and Mr. Don Burington, Attorney then representing Gasswint, and the plaintiffs herein, and considerable correspondence passed between said parties. The general topics discussed at such conferences, and covered in said correspondence, related to plaintiffs' infringement of the Clapper and Flora patents, (Roberts asserting the affirmative and Burington being dubiously negative); the amount of material plaintiffs had on hand for the production of "Work Warmers"; plaintiffs' desire to continue production of "Work Warmers" and if plaintiffs were not licensed to manufacture and sell tractor covers under said letters patent plaintiff would respect such patent rights; and the mutual desire of all parties, patentees, licensees and claimed infringers, to avoid costly patent litigation regarding those subjects. The sum total of all that transpired is that in March, 1950 it was finally resolved by defendants, acting jointly and in concert with one another, and in furtherance of the agreement of August

4, 1948, that plaintiffs would not be given a general license to manufacture tractor covers, the subject matter of the Clapper and Flora patents, but would be given permission, under special license, to dispose of some 573 "Work Warmers" then on hand, and be allowed to complete the processing of 650 other "Work Warmers", all of which were to be disposed of by plaintiffs on or before November 1, 1950; if, in turn, plaintiffs would consent to the filing of an infringement action by Clapper and Flora against plaintiffs in the United States District Court for the Northern District of Iowa, and plaintiffs would consent to a decree being entered therein, sustaining the validity of the Clapper and Flora patents and enjoining plaintiffs from infringement thereof. On March 29, 1950, an agreement (Plf's Ex. 5) to that effect was reduced to writing, duly executed by all the parties plaintiff and defendant herein; and an infringement action, in due course, was instituted against plaintiffs and proceeded with as therein provided.

Throughout the period of time above mentioned, defendants concertedly acted to stop plaintiffs from manufacturing tractor covers in infringement of the Clapper and Flora patents. The full extent of all economic duress imposed by defendants on the plaintiffs in respect to that matter was that defendants claimed that the Clapper and Flora inventions were covered by valid letters; the giving of notices to plaintiffs and their distributors that they were infringing the same; and that if such claimed infringement was not abated patent infringement proceedings were imminent; that such proceedings were essential to the continued exercise and enjoyment by the licensees of Flora and Clapper in their manufacture and sale of patent tractor covers and royalties paid to said patentees for such privilege. Plaintiffs, although dubious about the validity of the Clapper and Flora patents, were fully aware of the nature, character and extent of the economic duress so being imposed upon them by defendants. Through advice of counsel and with full knowledge

of the nature, character and extent of such duress, plaintiffs duly executed the agreement of March 29, 1950, referred to above.

On October 27, 1949, at a hearing held in the D & D Company bankruptcy proceedings, Gasswint, on behalf of plaintiffs, made request of Clapper for a license, at reasonable royalty, to manufacture and sell tractor covers, the subject of Clapper's letters patent. Clapper then told Gasswint that no such license could be granted by him, without the consent of his then licensees, under the written agreement he (Clapper) had with such licensees. Subsequent thereto and prior to March 29, 1950, Gasswint had other conversations with Clapper in which Gasswint requested a license under Clapper's letters patent. Clapper refused all such requests because of his obligation to Flora and the defendants licensees under the agreement of August 4, 1948. Clapper's testimony is that he did not communicate such request to the parties signatory to the agreement of August 4, 1948, because he thought there was no point in doing so, in light of his obligation under that agreement, and previous discussions had with the other parties thereto regarding the granting of other licenses. The only conclusion to be reached is that Clapper's refusal to then grant plaintiffs a license under his letters patent was the direct consequence and result of the execution and adherence to the provisions of the agreement of August 4, 1948 by the parties signatory thereto.

After consummation of the agreement of March 29, 1950 and entry of a decree in the infringement action in the United States District Court of Iowa accordingly, plaintiffs completed the processing and sale of "Work Warmers" as therein provided until November 1, 1950. The reason plaintiffs discontinued such operations was the result of their agreement with defendants, of March 29, 1950, and the impact upon them of the decree entered in the infringement action. Had plaintiff been successful in obtaining a bare license under the Clapper and Flora patents, on October 27, 1949 or at any time prior to November 1, 1950, plaintiffs would have continued in the business of manufacturing and selling tractor covers, the subject matter of said patents.

April 27, 1951, the United States of America filed a civil action in this District Court against the defendants herein, and Lee Flora and the Cab-Ette Company. On October 27, 1953, a consent decree was entered in that case, "before the taking of any testimony and without trial or adjudication of any issue of fact or law." By said decree defendants were, among other things, commanded by this Court:

> "(A) Each defendant is ordered and directed, in so far as it has or may acquire the power or authority to do so, to grant to any applicant making written request therefor a license to manufacture, use and sell tractor cabs under United States Patent No. 2,452,834 and Patent No. 2,461,974 and any other patent relating to tractor cabs issued to or acquired by any such defendant within five years from date hereof, such license to be for the full unexpired term of the patent or patents."

It was further provided in said decree:

> "The defendants Clapper and Flora are ordered and directed within sixty days after the entry of this Final Judgment to send a copy of this Final Judgment to each of their present licensees under any patent or patents to which Section IV of this Final Judgment may apply and to each applicant who has, in writing, heretofore applied for and has not received a license to manufacture, use or sell tractor cabs under any such patent or patents. In the case of applicants who may apply for a license to make, use or sell tractor cabs pursuant to Section IV of this Final Judgment, a copy of this Final Judgment shall be sent promptly to each such applicant immediately after receipt of any such application. Each defendant, not a patentee, shall upon inquiry from an

applicant for a license, advise the applicant to whom the application should be addressed, if known."

Pursuant to the mandates of said decree, a copy thereof was sent by Roberts to plaintiffs on December 15, 1953. Plaintiffs did not thereafter make any request of the patentees Clapper or Flora for a license to manufacture and sell the subject matter of their respective patents.

In the above factual background plaintiffs instituted the instant action against the defendants under Sections 1, 2, 14, 15 and 22 of the Sherman and Clayton Acts, Sections 1, 2, 14, 15 and 22, Title 15 U.S.C.A. The original claim asserted by plaintiffs was the alleged existence of a conspiracy between the defendants, and monopoly, in restraint * * * of interstate trade and commerce, having as their objective: price fixing; execution of cross-licensing agreements; the making and execution of contracts and agreements which resulted in the granting of patents to Clapper and Flora; the denial of licenses to "other manufacturers" than Comfort, Cab-Ette, and Burch; the threatening of plaintiffs and their dealers with infringement suits which forced plaintiffs to enter into a limited licensing agreement and submit to a consent decree in an infringement action, all of which caused the plaintiffs to abandon their business of manufacturing and selling "Work Warmers", to their damage. Plaintiffs have adduced no evidence before this Court and have made no claim relating to impact of any such alleged conspiracy or monopoly upon any other phases of business conducted by them, (i. e. awnings, tents, tarpaulins and other canvas goods) other than to that part of their said businesses relating to the manufacture and sale of "Work Warmers".

By order of Court entered at pre-trial conference the issue joined as to impact of conspiracy and monopoly upon all the plaintiffs' business operations, was separated from the issue of damages, the parties directed to adduce all evidence thereon, and that issue be first submitted to the Court for adjudication and determination before consideration be given to the quantum of damages, if any, sustained by plaintiffs. The parties have cooperatively complied with that order. Hence the record presently made should be considered, examined, and resolved in the light of the above "limitation of issue" order.

Before proceeding further, it is well for the Court to state, in view of the issues raised and presented by the plaintiffs' amended complaint, and the evidence adduced by the parties, what is *not* involved in this Sherman Act case. There is no evidence in the instant record relating to any "conspiracy to fix prices of tractor covers," if engaged in by the defendants, as having any impact, or causing any damage or injury to the plaintiffs' business operations. There is no evidence in the record relating to control by defendants of unpatented products, or material, which control, if existing, created any impact, or caused any damage or injury to the plaintiffs' business operations or property. Nor is there any evidence as to any impact, damage or injury resulting to the plaintiffs' businesses as a consequence of the control of place of manufacture, distribution of products, or division of distributors, even if engaged in by the defendants. The issue herein for determination, tersely stated, relates to an alleged conspiracy, having as its object the pooling of patents, control thereover by others than the patentees, resulting in giving of notices of infringement, and limiting the granting of licenses by patentees in restraint of interstate trade and commerce; and, attempt to establish a monopoly in restraint of such commerce through joint control by defendants of the subject matter of said patents, and the extent of impact thereof on the business operations of the plaintiffs.

 It is an axiom in private Sherman Act litigation that before damages may be recovered for claimed violation thereof, "[plaintiff] must establish two things: (1) A violation of the Anti-Trust Act and (2) damages to the plaintiff proximately resulting from the acts

of the defendant which constitute a violation of the Act." *Glenn Coal Co. v. Dickinson Fuel Co.*, 4 Cir., 72 F.2d 885, 887, and cases therein cited. The mere fact that the existence of a conspiracy to raise prices, control unpatented products, limit place of manufacture of goods, the distribution of products, or division of distributors, is established, is not sufficient, *ipso facto*, to support a judgment for damages in favor of plaintiffs under the Sherman Act. *Twin Ports Oil Co. v. Pure Oil Co.*, 8 Cir., 119 F.2d 747, 751. Mere possibility, conjecture, or surmise that damage to plaintiffs exists from such violations of the Act, without showing a casual connection between a specific violation and damages claimed, is wholly insufficient. *Ronson Patents Corp. v. Sparklets Devices, Inc.*, D.C.Mo., 112 F. Supp. 676. With those legal propositions in mind, we now state that evidence appearing in the instant record, whether it may be classified as a mere scintilla, or substantial, relating to price fixing, sale of unpatented articles, control of place of manufacture, distribution of products, or division of distributors, has not been shown to have had any impact on plaintiffs' businesses, because no casual connection is established in the evidence between any such matters and any of the plaintiffs' business operations. Such matters will hereafter be examined and considered from a broad aspect, only on the issue of conspiracy or monopoly actually existing, having some impact on the plaintiffs' businesses; namely, interference with plaintiffs' business operations by the giving of infringement notices, and refusal to grant a license to plaintiffs after valid request therefor. That, as we perceive the issue now before the Court, and evidence adduced thereunder, is the proper delimitation to be placed on the question of impact on plaintiffs' businesses from any claimed conspiracy or monopoly by defendants, when measured by the Sherman Act standards.

By the agreement of August 4, 1948, the patentees, Clapper and Flora, granted a non-exclusive and non-transferable license to Comfort, Cab-Ette, and Burch, to manufacture and sell their invention. The limitations imposed on the licensees by said agreement (i. e. that licensees would manufacture the inventions "at their respective * * * named addresses and in no other place or places"; that no other licenses would be granted "without obtaining the written consent thereto of the *remaining* parties to the agreement"; that if a license so granted was terminated as provided in paragraph 8 thereof, "Flora or Clapper, respectively, shall be at liberty to license other licensees"; that the parties would "mutually agree upon procedure for (the) disposition" of infringement suits; and the fact that the patentees were not themselves excluded from the field of manufacturing, using and selling their respective invention); reveal that the rights granted to licensees thereunder were not intended to be an assignment of patent rights, nor the grant of an exclusive license. Cf. *Broderick v. Neale*, 10 Cir., 201 F.2d 621. An exclusive license under patent law is tantamount to an assignment of patent rights, and any conveyance of such rights which does not either give: (1) "The exclusive right to make, use and vend the invention throughout the United States; or (2) an undivided part or share of that exclusive right; or (3) the exclusive right under the patent within and throughout a specified part of the United States * * * is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement." *Waterman v. Mackenzie*, 138 U.S. 252, 255, 11 S.Ct. 334, 335, 34 L.Ed. 923. Although a "distinguishing characteristic of an exclusive license is a promise, express or implied, by the licensee, that he will not thereafter license others," *Western Electric Co. v. Pacent Reproducer Corp.*, 2 Cir., 42 F.2d 116, 119 that fact does not, standing alone, characterize a license as being exclusive. Where two or more non-competing patent rights are granted to different licensees by a single instrument, and veto power over each such patent is not only

given to the co-patentees, but is also given to holders of similar licenses, they are not exclusive, but can only be considered non-exclusive. Cf. Walker on Patents, Vol. 2, pp. 1459–1463. Such is the legal effect of the licenses granted by the agreement of August 4, 1948; they were non-exclusive licenses, and not exclusive licenses as contended by defendants. Therefore, restraints imposed upon others than the licensees named in that agreement (i. e. upon the patentees and third persons) are to be measured, not by patent law standards, but by rules governing the validity of restrictions on competition according to Sherman Act standards. That is so because the patent laws were designed to only protect the patentee, and his assigns, in the whole or partial enjoyment of the fruit of his invention, and any restraint upon competition created by a license agreement that does not inure to the patentee, or his assigns, is not protected by the patent laws. Hence it is held that an agreement by a patentee which gives a non-exclusive licensee a veto power in the selection of other licensees, is invalid according to Sherman Act standards. United States v. Besser Mfg. Co., D.C.E.D. Mich., 96 F.Supp. 304, affirmed 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063; United States v. American Linen Supply Co., 7 Cir., 141 F.Supp. 105; United States v. Crown Zellerbach Corp., 7 Cir., 141 F. Supp. 118. It cannot be successfully contended by defendants that the terms of the license agreement, supra, are not, *per se*, violative of Section 1 of the Sherman Act in the aspects hereinabove considered, and we so adjudge it.

We think said agreement is also violative of Section 2 of the Act, in that it manifests an attempt to monopolize, by the combining of non-competing patents in a single agreement, by competitors, and gives to the parties to the agreement veto power over patent rights that are not referable to their individual business, the patents or licenses granted, and this is true, even though the licensees may have continued to compete with each other in the manufacture and sale of tractor covers after the execution thereof. They were jointly given an exclusive market and control thereover by the terms of said agreement and not singularly as a consequence of patent privileges acquired. United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701. We shall not undertake to analyze all the provisions of said agreement that we considered to be violative of the above sections of the Sherman Act (there appear to be several) but confine our consideration thereof to those features which we perceive pertinent to the issue of impact as above delimited.

By Section 13 of the agreement, the parties agreed to and the evidence establishes that they did act jointly in respect to "infringements" of the letters patent in question, and "mutually agree upon procedure for their disposition." In Section 14, Clapper and the licensees set up a "Litigation Fund" to be used for the prosecution of infringements of both said letters patent, upon approval of a majority of the parties to the agreement, and the evidence is that said fund was actually used by them for that purpose. The clear intent of the parties, gleaned from the verbiage contained in paragraphs 13 and 14, supra, and from the evidence herein was giving to each party thereto a separate and collective right to bring and control infringement actions, when no such right or power legally existed in the licensees, or opposite patentee, so to do under patent law; that they jointly and cooperatively intended to and did unite in the prosecution, and use of the "Litigation Fund" for that purpose. The action of the parties as revealed by the evidence is that they did, pursuant to the said agreement, join hands, through Roberts, in the giving of infringement notices to plaintiffs and their dealers, and in so doing they intended to curtail and ultimately stop the manufacture and distribution of tractor covers by plaintiffs, and sale thereof by plaintiffs' distributors. The evidence clearly establishes that defendant licensees were the major manufacturers of tractor covers and held a dominant posi-

tion in that field of interstate trade and commerce, and that if the agreement of August 4, 1948 was carried out by the parties, according to its terms, as it was, that the monopoly granted to said licensees gave them virtual control of that market and made it impossible for plaintiffs to obtain any rights under the patents in issue, or legitimately enter the field of manufacturing and selling tractor covers. It is the fact of combination and concert of action by the parties to do the very things that they claim they had a right to do under said agreement, collectively and jointly, that spells out unlawful use of patent monopoly by them, in violation of Sections 1 and 2 of the Sherman Act.

It is no defense of the agreements of August 4, 1948, or March 28, 1950, or for the giving of infringement notices and bringing of the infringement action as mentioned above, to say that Clapper and Flora had the right to grant separate licenses to defendant licensees and that said patentees had the right under patent law to give notices of infringements of their respective patents, and to bring infringement actions. It is conceded that such are legal rights accruing to a patentee, or his assign or assigns. But what may be legally done by a patentee, or his assign, singularly or collectively, is no criterion for the measurement of legality of the agreement of August 4, 1948, and what was actually done by the defendants in furtherance thereof as shown by the evidence. What Clapper, or Flora, separately, might legally have done and what was done by them in concert of action with each other and with the licensees herein are two different matters. The fact that concert of action, violative of the Sherman Act, is accomplished by legal means, does not remove the terminal result thereof from the prohibitions of the Act. A conspiracy or combination having as its object, or effect, a restraint of interstate trade and commerce, whether accomplished by legal or illegal means, falls within the ambit of Sections 1 and 2 of the Sherman Act and is condemned thereby. Patent

rights give no protection from the prohibition of the Sherman Act, when they are asserted, controlled, or used in consequence of an agreement that is in restraint of interstate trade or commerce. Cf. United States v. New Wrinkle, Inc., 342 U.S. 371, 72 S.Ct. 350, 96 L.Ed. 417. When two individual patentees combine their valid patent monopolies and contract between themselves and with their licensees to secure mutual benefits for themselves and their licensees that are not given to them by the patent laws, and which agreement gives to the opposite patentee and the licensees a right of control over patent rights that may be asserted, and is used in restraint of interstate trade and commerce, the purpose and result of such an arrangement and conduct is clearly in violation of Sections 1 and 2 of the Sherman Act. Cf. United States v. United States Gypsum Company, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; United States v. Line Material Co., supra; and United States v. New Wrinkle, Inc., supra.

The only conclusion to be drawn from the evidence is that the agreement of March 29, 1950, was directly the result of joint and concerted action on the part of defendants, and this is so, whether plaintiffs voluntarily, or as the result of economic force (their claimed financial inability to defend themselves against the claims of infringement), acquiesced therein. Each of the defendants individually, or through their authorized representative, are shown to have acted in some degree in furtherance of the consummation of that agreement. They each either proffered, controlled, directed, or participated in the consummation of the agreement that was made with the plaintiffs on March 29, 1950, or ratified and acquiesced therein. Prior to the time of negotiating that agreement, plaintiffs requested and were refused by Clapper the privilege of a license under his letters patent. During the negotiations leading up to said agreement, a like request was made and refused by Roberts. The evidence surrounding such requests for, and mode of

refusal of, a license is such that the only logical conclusion to be reached therefrom is that the refusal was premised in the agreement of August 4, 1948, and that the defendants concertedly agreed pursuant thereto, that no bare license to manufacture and sell tractor covers under the Clapper or Flora patents would be granted to the plaintiffs. That is so, even though no specific request for a license under the Flora patent is shown, for the further conclusion to be gleaned from the evidence is, that if any such request had been made it would likewise have been refused as the result of said agreement and conspiracy between the defendants. That conclusion clearly arises in the evidence and, we think, was made known to Gasswint and Burington prior to the time of the execution of the agreement of March 29, 1950. Hence said agreement of March 29, 1950, resulting from conspiracy between the defendants, being in restraint of interstate trade and commerce, because plaintiffs were only granted a limited license thereby, cannot be legally binding upon the plaintiffs. The granting of a limited license to plaintiff by said agreement was manifestly the result of a conspiracy. That plaintiffs agreed thereto did not make that agreement valid. The restraint of trade or commerce occasioned thereby continued after the execution thereof and was only relaxed to the extent of the limited license granted.

After the consummation of the agreement of March 29, 1950, the infringement action was instituted by Clapper and Flora in the United States District Court for the Northern District of Iowa. Plaintiffs, throughout the pendency of the instant action, have conceded that they entered their appearance in that action, that the decree entered therein remains in full force and effect, and, as a consequence thereof, they "cannot resume the manufacture of tractor covers with freedom" from contempt for violation of the terms of that decree, unless plaintiffs are granted a license under the Clapper and Flora patents. We agree that plaintiffs are so bound by said decree and that the validity of the Clapper and Flora patents is thereby made *res judicata* as between plaintiffs and said patentees. Plaintiffs have made no effort whatsoever to have said decree annulled or vacated by the Court in which it was entered before bringing the instant action. They did not proffer a defense in that action that was known to them, which, if asserted, would have been cause for that Court to refuse to entertain the action. Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376. Thus they stand before this Court as having been amerced as infringers of the Clapper and Flora patents by a court of competent jurisdiction, and conceding that to some extent they ceased manufacturing "Work Warmers" as a result of the impact of that decree. The conclusion is that the impact of any conspiracy between the defendants, resulting from the giving of notices of infringement and prosecution of an infringement action against the plaintiffs terminated with the entry of that decree. Hence plaintiffs cannot recover herein from defendants damages resulting to any of their business operations, after the entry of said decree, because of claimed impact in the giving of notices of infringement to dealers, nor as a consequence of bringing that infringement action against the plaintiffs. The Court cannot, in this action, relieve plaintiffs from the legal effect and consequences of that decree. There is no such issue before this Court, though it is established by the evidence that said action was instituted pursuant to a conspiracy in violation of the Sherman Act. Clapper and Flora can still claim the benefits of that decree against the plaintiffs, until it is set aside by the Court in which it was entered. Plaintiffs' cessation of operations directly and solely resulting from the impact of that decree are *damna absque injuria*.

The question remains: Does plaintiffs' amercement as infringers of the Clapper and Flora patents prevent them, as a matter of law, from claiming

damages for any impact of conspiracy because of refusal of a license as a result of conspiracy, even though they were carrying on some business in violation of these patents? We now think not. Concededly, Clapper and Flora, as patentees, could individually have refused a license to the plaintiffs. But, notwithstanding their individual right to so act, they, and the other defendants, had no legal right to act in concert and join hands under an agreement shown to be in violation of the Sherman Act, to bring about that result. The fact that interstate commerce is carried on in violation of some law, does not validate a conspiracy conceived and carried out in restraint of commerce in violation of the Sherman Act. The award of damages in a private Sherman Act case is authorized by the Congress as a means of vindication of the free trade policy sought to be protected by that Act, even though such trade may be carried on in violation of some other law. It is for that reason that the courts hold that a collateral defense of *pari delicto* is no defense to such actions. Cf. Moore v. Mead Service Co., 10 Cir., 184 F.2d 338, vacated 340 U.S. 994, 71 S.Ct. 528, 95 L. Ed. 681, reconsidered, 10 Cir., 190 F.2d 540; Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; and Kobe, Inc., v. Dempsey Pump Co., D.C., 97 F.Supp. 342, affirmed 10 Cir., 198 F.2d 416. It is noted that in the first three cases here cited, the *pari delicto* defense was not established in respect to an illegal subject matter, damages to which were claimed because of Sherman Act violations. The violations of law therein considered were collateral to a subject matter legally moving in interstate commerce. A close examination of the record in the Kobe case, supra, will reveal that the patented article there involved was limited to the design of a pump, covered by a patent which expired eight months before the trial, the sale of which during the period of conspiracy and monopoly by defendants was only a minor part of Dempsey's business affected by Sherman Act violations; and, that the issue of *pari delicto* was not raised as to the damages claimed or allowed therein. In the case at bar we have a different situation. Here plaintiffs seek to recover loss of profits from the sale of devices adjudged to be in violation of both the Clapper and Flora patents. Fortifying authorities need not be cited to sustain the proposition that plaintiffs, as infringers, had no legal right to make any profits from the sale by them of infringing devices and could have been made to account therefor in an appropriate action. That they were not required to do so, or were released from that obligation, is of no moment here. The fact is, that the anti-trust laws contemplate injury and damages to a legal right, and plaintiffs having no legal right to profits from the sale of infringing tractor covers, cannot claim damages by way of loss of such illegal profits. Cf. Keogh v. Chicago & Northwestern R. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183; Okefenokee Rural Electric Membership Corp. v. Florida Power & Light Co., 5 Cir., 214 F.2d 413; and Maltz v. Sax, 7 Cir., 134 F.2d 2. As above stated, plaintiffs, as infringers of Clapper's or Flora's patents, could be held responsible therefor by those patentees. But such infringement did not give rise to any right in said patentees and the other defendants to take concerted action against the plaintiffs on that score. Paraphrasing what was said in the Kiefer-Stewart case, supra, the fact that plaintiffs were infringers did "not legalize the unlawful combination by [defendants] nor immunize them against liability" for damages the plaintiffs may have sustained to their legal business or property, resulting from conspiracy. 340 U.S. loc. cit. 214, 71 S.Ct. loc. cit. 261.

■ The privilege of restraining others is granted to the owner of letters patent. He is given no right or privilege to restrain himself, or to join with others and impose restraints not given by patent law. Cf. Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107.

In light of the foregoing, we hold that plaintiffs cannot recover damages herein by way of loss of profits from actual or potential sales they might or could have made solely from the manufacture and sale by them of their infringing tractor covers. But, in connection with such infringing business, plaintiffs are shown to have owned machinery, tools and dies capable of being used in the legitimate manufacture and processing of tractor covers which had some value. The fact that such machines, tools and dies were used in the production of infringing tractor covers did not destroy their value. Had plaintiffs been granted a license under the Clapper and Flora patents, such machinery, tools and dies could have been used in the legitimate production of tractor covers. The evidence is that plaintiffs were denied such a license as a direct result of defendants' concerted acts and conduct. If plaintiffs sustained any damage, or loss, to such machinery, tools, or dies, resulting therefrom, they may attempt to make proof thereof. If plaintiffs can establish that they suffered any loss of profits in their business, directly resulting from refusal of a license to manufacture and sell tractor covers under the Clapper and Flora patents after valid request therefor, solely because of conspiracy, then plaintiffs may undertake to make proof thereof. The impact of any such conspiracy must be held to have been imposed on a legal right, resident in the plaintiffs to make and negotiate for such a license and not have it refused as a consequence of conspiracy. If they were so precluded by a conspiracy, as the evidence shows they were, from thereby continuing in business, they may assert a claim therefor under Section 4 of the Clayton Act, Section 15, Title 15 U.S.C.A.

It is unnecessary at this time to consider the nature, character, or extent of any such damages. That is a matter to be considered when the issue of damages is reached. Large or small, plaintiffs have the right to attempt to make proof of any and all such damages so occasioned to their business or property. However, the proof adduced by the plaintiffs respecting damages to their businesses or property must be such as is shown to have accrued between June 17, 1949 and May 6, 1953. That is to say, between the date Gasswint, on behalf of plaintiffs, first made request for a license from Clapper during the D & D bankruptcy proceedings and date of execution of the agreement terminating the "License Agreement" of August 4, 1948, and the distribution of the "Litigation Fund" between Clapper and Flora. The conspiracy and monopoly here established is shown to have terminated at that time.

This action should be dismissed as to the plaintiff Waterloo Tent and Awning Company, because that Corporation is no longer in existence. There has been no showing of a right resident in the other plaintiffs to recover any damages Waterloo may have sustained as a result of the conspiracy here charged to exist between defendants. An order of dismissal will be entered herein accordingly when final judgment is entered between the other parties.

Defendants' motion for judgment at the close of all the evidence, filed May 9, 1956, is by the Court overruled.