UNITED STATES *v.* NEW WRINKLE, INC. ET AL.

No. 250.   Argued January 10–11, 1952.—Decided February 4, 1952.

*Charles H. Weston* argued the cause for the United States.   With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Robert L. Stern* and *Daniel M. Friedman.*

*H. A. Toulmin, Jr.* argued the cause and filed a brief for New Wrinkle, Inc., appellee.

*Samuel L. Finn* filed a motion to dismiss for the Kay & Ess Company, appellee.

Mr. Justice Reed delivered the opinion of the Court.

This suit against New Wrinkle, Inc., and The Kay & Ess Co. was instituted in the United States District Court for the Southern District of Ohio by the United States as a civil proceeding under § 4 of the Sherman Act.[1] Defendants are charged with having violated § 1 of that law[2] by conspiring to fix uniform minimum prices and to eliminate competition throughout substantially all of the wrinkle finish industry[3] of the United States by means of patent license agreements. Motions to dismiss the suit were filed by defendants. The defendant Kay & Ess urged that the complaint failed to state a cause of

---

[1] 15 U. S. C. § 4:

"The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1–7 of this title; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises."

[2] *Id.*, § 1.

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: . . . ."

[3] "8. 'Wrinkle' finishes, also known as 'Crinkle,' 'Shrivel,' 'Sag,' 'Morocco,' and by other designations, are defined as enamels, varnishes and paints which have been compounded from such materials and

action. Defendant New Wrinkle pressed a sole contention: that it was not then and never had been engaged in interstate commerce and could, therefore, not be guilty of violating the Sherman Act.

The District Court, without opinion, thereafter entered separate judgments as to each defendant dismissing the complaint and reciting in each judgment that the motion to dismiss was "well taken." A petition for appeal was filed and allowed, and on October 8, 1951, probable jurisdiction was noted on direct appeal pursuant to a jurisdiction conferred on this Court by § 2 of the Expediting Act of February 11, 1903. 15 U. S. C. § 29.

## I.

In granting the motions of defendants, the District Court, of course, treated the allegations of the complaint as true. In substance the complaint charges that prior to and during 1937, defendant Kay & Ess was engaged in litigation with a named coconspirator, the Chadeloid Chemical Co., in regard to certain patents covering manufacture of wrinkle finish enamels, varnishes and paints. Each company claimed it controlled the basic patents on wrinkle finish, contending that the patents of the other

by such methods as to produce when applied and dried, a hard wrinkled surface on metal or other material.

"9. Wrinkle finishes are widely used as coverings for the surfaces of typewriters, cash registers, motors, adding machines, and many other articles of manufacture. They have the following advantages over smooth finishes such as ordinary enamels and varnishes:

"a. One coat of wrinkle finish is sufficient for many purposes for which two or more coats of smooth finish would be required;

"b. Surfaces to which wrinkle finishes are to be applied need not be prepared as carefully as those which are to receive smooth finishes, since the wrinkle finishes cover small imperfections; and

"c. The original appearance of wrinkle-finished articles can be maintained with less cleaning and polishing than that of smooth-finished articles."

were subservient to its own. Negotiations throughout 1937 resulted in a contract entered into by Kay & Ess and Chadeloid on November 2, 1937. This contract made provision for the organization of a new corporation, the defendant New Wrinkle. Both Kay & Ess and Chadeloid agreed to accept stock in the new company in exchange for assignments of their wrinkle finish patents. New Wrinkle was to grant patent licenses, incorporating agreements which fixed the minimum prices at which all licensed manufacturers might sell, to the manufacturers in the wrinkle finish industry, including Kay & Ess and Chadeloid. The price-fixing schedules were not to become operative until twelve of the principal producers of wrinkle finishes had subscribed to the minimum prices prescribed in the license agreements.

Pursuant to this arrangement, the complaint charges New Wrinkle was incorporated, and the patent rights of Kay & Ess and Chadeloid were transferred to it. In conjunction with other named companies and persons, the defendants and Chadeloid thereafter worked together to induce makers of wrinkle finishes to accept the price-fixing patent licenses which New Wrinkle had to offer. These prospective licensees were advised of the agreed-upon prices, terms and conditions of sale in the New Wrinkle licenses, and they were assured that like advice was being given to other manufacturers "in order to establish minimum prices throughout the industry." After May 7, 1938, when the requisite twelve leading manufacturing companies had accepted New Wrinkle licenses, the price schedules became operative. By September 1948, when the complaint was filed in this action, more than two hundred, or substantially all, manufacturers of wrinkle finishes in the United States held nearly identical ten-year extendable license agreements from New Wrinkle. These agreements required, among other things, that a licensee observe in all sales of products cov-

ered by the licensed patents a schedule of minimum prices, discounts and selling terms established by the licensor New Wrinkle. Upon thirty days' notice in writing, New Wrinkle might alter any or all of the terms of the price schedule, but such prices, terms and discounts as New Wrinkle might establish were to bind the licensee only if imposed at the same time and in the same terms upon the licensor and all other licensees.[4] Termination provisions in the agreements required a licensee to give three months' written notice and allowed the licensor to terminate the license if a licensee failed to remedy a violation of the agreement within thirty days after written notice thereof by the licensor. A 5-cent per gallon royalty was made payable on all wrinkle finish sold or used by a licensee, said royalty to be reduced to the same figure as that contained in any subsequent license granted at a lower royalty charge.

New Wrinkle, acting with the consent of its licensees, issued at intervals "License Rulings" giving minimum

---

[4] A copy of the license was filed with the complaint. An important section, § 7, reads, so far as material in this proceeding, as follows:

"7. The Licensor hereby reserves and shall have the right at any time to establish a Schedule of Minimum Prices, Discounts, and Selling Terms only in accordance with which Licensee, Licensor, and all other Licensees shall thereafter sell or otherwise dispose of products covered by patents included herein, and thereafter to modify, amend and suspend any such Schedule and/or establish a New Schedule. . . . The Licensor announces as a matter of policy that it will fix said price based upon the cost of raw materials and labor as reported by the United States Department of Commerce and the United States Department of Labor, plus the royalty charged hereunder, it being the intent and purpose of the Licensor to open to the entire trade the use of these patents so licensed at the lowest price consistent with a reasonable profit to the manufacturer, Licensee, the trade, and to this Licensor. No Schedule of Minimum Prices, Discounts and Selling Terms nor any modification or amendment or suspension thereof shall be binding upon Licensee unless at the same time and in the same terms imposed upon Licensor and all other Licensees."

prices, detailed terms and conditions such as allowable discounts and permissible practices. The requirements of these "Rulings" were adhered to by the licensees. Since an entire copy of "License Rulings," as filed with the complaint as an exhibit, is too bulky for reprinting, the schedule of prices operative at the time of the filing of the complaint in this action, as illustrative, is set out in an Appendix to this opinion, *post*, p. 381. It precisely details and makes rigid the selling procedure for a variety of minutely prescribed products deemed to be covered by the patents and the license agreements.

## II.

Since the motions to dismiss must be deemed to admit all of the above as true, we need only consider whether or not these facts would establish a violation of § 1 of the Sherman Act by appellees, New Wrinkle and Kay & Ess.

Appellee, New Wrinkle, differs from Kay & Ess. New Wrinkle is not a manufacturer of the commodities covered by its patents. It is solely a holder or owner of the patents, granting the right of making and vending to others. Kay & Ess does manufacture under the New Wrinkle license. New Wrinkle urges that its abstention from manufacturing activities and concentration on patent licensing insulates its activity from the prohibitions of § 1 of the Sherman Act. Persons engaged exclusively in licensing patents are said by appellee to be exempt from the Sherman Act because such contracts are not commerce and are functions solely controlled by the patent laws. For the contention that its licensing is not commerce, reliance is placed on *New York Life Ins. Co. v. Deer Lodge County*, 231 U. S. 495, and cases involving such local incidents of interstate commerce as were treated in *United Shoe Machinery Co. v. United*

*States.*[5] For the latter contention, if we understand the argument correctly, New Wrinkle asserts that since patents give their owners a right to sell, they may do so on such terms as they please because they are merely selling personal services, and such services are not commerce, citing *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 502, a case holding that a strike to unionize a factory did not violate the Sherman Act.

These contentions leave out of consideration the allegations of the complaint concerning the alleged combination in restraint of trade. The United States charges the use of patent licenses as an essential part of the plan to restrain trade, a trade in enamels, varnishes and paints that is alleged to be and obviously is interstate in character. It charges that the price control is an essential part of that restraint.

We think it beyond question that this making of license contracts for the purpose of regulating distribution and fixing prices of commodities in interstate commerce is subject to the Sherman Act, even though the isolated act of contracting for the licenses is wholly within a single state. Certainly since *United States* v. *Trenton Potteries,* 273 U. S. 392, 397 (decided in 1927), price fixing in commerce, reasonable or unreasonable, has been considered a *per se* violation of the Sherman Act.[6] Likewise it is clear that, although the execution of a contract of insurance may not be interstate commerce,

> "If contracts of insurance are in fact made the instruments of restraint in the marketing of goods and services in or affecting interstate commerce, they are not beyond the reach of the Sherman Act more than

---

[5] 258 U. S. 451, 465. There it is said:
"It is true that the mere making of the lease of the machines is not of itself interstate commerce."

[6] *United States* v. *Line Material Co.,* 333 U. S. 287, 307.

contracts for the sale of commodities,—contracts which, not in themselves interstate commerce, may nevertheless be used as the means of its restraint." [7]

And so it is with patent license contracts which are a part of a plan to restrain commerce. Patents give no protection from the prohibitions of the Sherman Act to such activities, when the licenses are used, as here, in the scheme to restrain. The allegations of the complaint cover such a situation and New Wrinkle and its manufacturing licensee, Kay & Ess, are alike covered by the prohibitions of § 1.

### III.

Appellees argue further, however, that the principles of *United States* v. *General Electric Co.*, 272 U. S. 476, and *Bement* v. *National Harrow Co.*, 186 U. S. 70, control here. Since we examined these principles in detail as recently as 1948, we draw upon that discussion for our conclusions here.[8] The *Bement* and *General Electric* cases allowed a patentee to license a competitor in commerce to make and vend with a price limitation controlled by the patentee. When we examined the rule in 1948, the holding of the *General Electric* case was left as stated above. 333 U. S. at 310. But it was pointed out that

"the possession of a valid patent or patents does not give the patentee any exemption from the provisions of the Sherman Act beyond the limits of the patent monopoly." P. 308.

---

[7] *United States* v. *Underwriters Assn.*, 322 U. S. 533, dissent 570, see majority 546. And see *Polish Alliance* v. *Labor Board*, 322 U. S. 643, 647, and *Lorain Journal Co.* v. *United States*, 342 U. S. 143, 149.

[8] *United States* v. *Line Material Co.*, 333 U. S. 287; *United States* v. *United States Gypsum Co.*, 333 U. S. 364.

We said that

> "two or more patentees in the same patent field may
> [not] legally combine their valid patent monopolies
> to secure mutual benefits for themselves through con-
> tractual agreements, between themselves and other
> licensees, for control of the sale price of the patented
> devices." P. 305.

Price control through cross-licensing was barred as beyond
the patent monopoly.

On the day of the *Line Material* decision, this Court
handed down *United States* v. *United States Gypsum Co.*,
333 U. S. 364. The *Gypsum* case was based on facts
similar to those here alleged except that the patent owner
was also a manufacturer. We have pointed out above
in section II of this opinion that we consider the fact that
New Wrinkle is exclusively a patent-holding company of
no significance as a defense to the alleged violation of
the Sherman Act. We said in *Gypsum* that

> "industry-wide license agreements, entered into with
> knowledge on the part of licensor and licensees of
> the adherence of others, with the control over prices
> and methods of distribution through the agreements
> and the bulletins, were sufficient to establish a *prima
> facie* case of conspiracy." P. 389.

On remand, the prima facie case resulted in a final judg-
ment, affirmed by this Court.[9] In discussing the *General
Electric* case, the Court was unanimous in saying that it

> "gives no support for a patentee, acting in concert
> with all members of an industry, to issue substantially
> identical licenses to all members of the industry under

---

[9] *United States* v. *United States Gypsum Co.*, 340 U. S. 76. Com-
pare as to copyrights *United States* v. *Paramount Pictures*, 334 U. S.
131, 143.

the terms of which the industry is completely regimented, the production of competitive unpatented products suppressed, a class of distributors squeezed out, and prices on unpatented products stabilized. . . . it would be sufficient to show that the defendants, constituting all former competitors in an entire industry, had acted in concert to restrain commerce in an entire industry under patent licenses in order to organize the industry and stabilize prices." Pp. 400–401.

We see no material difference between the situation in *Line Material* and *Gypsum* and the case presented by the allegations of this complaint. An arrangement was made between patent holders to pool their patents and fix prices on the products for themselves and their licensees. The purpose and result plainly violate the Sherman Act. The judgment below must be

*Reversed.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.

# APPENDIX TO OPINION OF THE COURT.

## NEW WRINKLE, INC.

### Licensors of Processes and Finishes

### MINIMUM PRICE SCHEDULE No. 5

(Announced June 1, 1947)
EFFECTIVE JULY 1, 1947

(Superseding Minimum Price Schedule No. 4 as revised December 12, 1946)

Part of New Wrinkle, Inc., License Agreement

Dated April 1, 1938

The following are the minimum prices at which patented Wrinkle Finish may be sold under License Agreement, to take effect on July 1, 1947 and to remain in force until further notice.

### WRINKLE FINISH CLEAR

|        | 1 Gal. | 5 Gal. | ½ Drum | Drum |
|--------|--------|--------|--------|------|
| —100   | $2.85  | $2.70  | $2.65  | $2.60 |
| +100   | 2.70   | 2.55   | 2.50   | 2.45 |

### WRINKLE FINISH BLACK

|      |      |      |      |      |
|------|------|------|------|------|
| —100 | 3.40 | 3.25 | 3.20 | 3.10 |
| +100 | 3.25 | 3.10 | 3.05 | 2.95 |

### WRINKLE FINISH ORDINARY COLORS

|      |      |      |      |      |
|------|------|------|------|------|
| —100 | 3.65 | 3.50 | 3.40 | 3.35 |
| +100 | 3.50 | 3.35 | 3.25 | 3.20 |

### WRINKLE FINISH ORGANICS     (see page 3)

|      |      |      |      |      |
|------|------|------|------|------|
| —100 | 4.00 | 3.85 | 3.75 | 3.70 |
| +100 | 3.85 | 3.70 | 3.60 | 3.55 |

### WRINKLE FINISH METALLICS     (see page 3)
(Addition of metallic to clear Wrinkle)

|      |      |      |      |      |
|------|------|------|------|------|
| —100 | 3.50 | 3.35 | 3.25 | 3.20 |
| +100 | 3.35 | 3.20 | 3.10 | 3.05 |

In the event that a metallic is added to a pigmented Wrinkle Finish, the established minimum for that pigmented finish, plus $.25, will be the minimum price.

Reductions in price for quantity as shown on above schedule are permissable on and shall apply only to quantities of wrinkle finish contained in a single shipment.

Wrinkle Finish in concentrated form or ingredients from which customer may produce wrinkle finish may be sold by Licensee only at minimum price per gallon on the number of gallons of the kind or color of wrinkle finish for final use by the customer that can normally be produced by adding to such concentrate or ingredients supplied by Licensee.

Clear Wrinkle Finish sold by Licensee under circumstances charging seller with knowledge that customer intends converting same into colored wrinkle finish may be sold only in accordance with the minimum price per gallon hereby established for wrinkle finish of the color and quantity in question.

Prices are f. o. b. destination or freight allowed.

In the event of cancellation of orders or return of goods prices shall be readjusted and settlement made according to the actual quantities purchased and retained.

Terms: 30 days net, 1% for cash within ten days after shipment.

In making bids, it is not permissable to deduct the cash discount. The cash discount of 1% can only be given or allowed if the "Wrinkle Finish" is actually paid for within ten days after shipment.

See minimum Price Schedule (No. 2-A) on Page 7 for Canadian Prices.