**NEWBURGH MOIRE CO., Inc. v. SUPERIOR MOIRE CO., Inc.**

Civ. A. No. 626–51.

United States District Court
D. New Jersey.

June 5, 1952.

Harry B. Rook, Samuel J. Stoll, New York City, for plaintiff.

Harry Sommers, Newark, N. J., for defendant.

MODARELLI, District Judge.

Plaintiff filed this action to enjoin alleged infringement by defendant of two patents

for producing moire pattern effects in fabrics. The patents were issued in 1948 and 1950 to plaintiff's assignor, August Holterhoff. In brief, the production of a moire pattern is effected by moistening the fabric in confined pattern areas, applying tension, drying the fabric while maintaining tension, folding the fabric double and applying heat and pressure. Defendant at this juncture moves to dismiss the complaint on the ground that plaintiff has violated the antitrust laws and misused its patents in suit by entering into minimum price agreements with its licensees under the patent.

The first question which arises is: Should a patent infringement complaint be dismissed on defendant's motion if it appears as a matter of law that the patents in suit have been misused in violation of the antitrust laws?

In Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, the patentee brought a suit for infringement of a machine used by the canning industry for depositing salt tablets into the contents of cans. The patentee leased its salt depositing machine with licenses for use on the condition that salt tablets required by its licensees be bought exclusively from patentee's wholly owned subsidiary. The trial court granted defendant's motion for summary judgment without passing on the issues of validity and infringement. The Supreme Court upheld the dismissal on the ground that patentee's course of conduct was adverse to the public interest, disqualifying him to maintain the suit. The decision was based not upon whether the patentee had violated a specific anti-trust law, but on the broader ground that "a court of equity will (not) lend its aid to protect the patent monopoly when respondent is using it as the effective means of restraining competition * * *." 314 U.S. at page 490, 62 S.Ct. at page 404. To the same effect was Mercoid Corporation v. Mid-Continent Investment Co., 1944, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, where the patentee endeavored by its license agreements to prevent the sale or use of any unpatented electrical switch with its patented heating system unless manufactured by a specified third party. See also

Sola Electric Co. v. Jefferson Co., 1942, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165, and Hartford-Empire Co. v. United States, 1944, 323 U.S. 386, at page 415, 65 S.Ct. 373, at page 388, 89 L.Ed. 322, where the court in passing refers to " * * * the doctrine that, so long as the patent owner is using his patent in violation of the antitrust (sic) laws, he cannot restrain infringement of it by others."

In conformity with these concepts, the Court of Appeals of this the Third Circuit remanded to the District Court for dismissal the case of National Lockwasher Co. v. George K. Garrett Co., 3 Cir., 1943, 137 F.2d 255. There the patentee had required its licensees to agree not to manufacture any other form of the patented article. Judge Smith of this District in Chiplets, Inc. v. June Dairy Products Co., D.C.1950, 89 F.Supp. 814, granted a motion of dismissal against a patentee that leased its machines to producers conditioned upon the exclusive use of the lessor's machines and prohibiting the use of other machines whether patentable or unpatentable. The Chiplets case depended for authority on Mercoid Corporation v. Mid-Continent Investment Co., supra. The Supreme Court there stated that a patent is a privilege conditioned by a public purpose, limited to the invention which it defines, and

"When the patentee ties something else to his invention, he acts only by virtue of his right as the owner of property to make contracts concerning it and not otherwise. He then is subject to all the limitations upon that right which the general law imposes upon such contracts. The contract is not saved by anything in the patent laws because it relates to the invention." 320 U.S. at page 666, 64 S.Ct. at page 271, 88 L.Ed. 376.

The above discussion of authority leads to an inescapable affirmative answer to the question of whether a patent infringement suit should be dismissed where it is shown that the patent privilege has been misused in violation of the anti-trust laws or as a means of restraining competition.

We turn now to the essential inquiry raised by the motion to dismiss: Did this plaintiff misuse the patent privilege in restraint of trade or in violation of the antitrust laws?

The parties to this suit do not manufacture the goods, they are processors. They receive goods from their accounts, subject them to the moire process for certain pattern effects, and return them to the customers.

At the time of the hearing of this motion, there were four moire finishers in the country, including the two parties before the court. Present information is that a fifth concern has entered the field and that as of this time, the five comprise the only companies employing the process in the country.

Two of the five are licensed by the plaintiff. It was admitted both by the deposition of the treasurer of plaintiff (deposition of Hans Holterhoff, pages 10 to 13) and by plaintiff's attorney in court that the Newburgh Moire Company, Inc., establishes a minimum price list to which its licensees must abide. In the words of the license agreement which was read into the record:

> "The licensor is entitled to fix the minimum prices which are to be charged by the licensee for the goods processed and sold under this agreement." (Transcript of Hearing, page 3.)

Licensees are also required to report their production volume to plaintiff for the alleged purpose of determining the amount of royalties due.

Thus, of a total of five companies engaged in processing cloth for moire effect, three are committed to a fixed minimum price schedule.

■ The basic proposition is clear that price fixing is violative of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq. It is of no moment whether the price fixed is reasonable or unreasonable. United States v. Trenton Potteries, 1927, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Univis Lens Co., 1942, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408; and Sola Electric Co. v. Jefferson Co., supra. Do patents serve to set the agreement without the scope of the Sherman Act?

A case study must date from the rule set down by United States v. General Electric Company, 1926, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362, that a patentee may include a price limitation in its license agreement with a competitor. That rule was restricted in United States v. Line Material Co., 1948, 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701, to prevent two or more patentees in the same field to combine through agreements amongst themselves and their licensees for control of sale prices. In short, cross licensing with price-fixing provisions was declared violative of the Sherman Act. Four concurring justices expressed the opinion that the General Electric case should be overruled. The opinion of the court, which in a curious split was voiced by Justice Reed with no other justice joining, construed the General Electric case as allowing the patentee to license only *one* competitor with a price restriction:

> "The patent statutes give an exclusive right to the patentee to make, use, and vend and to assign any interest in this monopoly to others. The General Electric case construes that as giving a right to a patentee to license *another* to make and vend at a fixed price." 33 U.S. at page 312, 68 S.Ct. at page 563, 92 L.Ed. 701. Emphasis supplied.

Came United States v. United States Gypsum, 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. The District Court had in that case dismissed the government's complaint. The Supreme Court reversed and remanded on the ground that violation of the Sherman Act was clear. There as in the instant case, the patentee controlled the prices charged by its licensees. In that case, however, the combination comprised "all members" of the industry. In addition, the industry was "completely regimented, the production of competitive unpatented products suppressed, a class of distributors squeezed out, and prices on unpatented products stabilized." 333 U.S. at page 400, 68 S.Ct. at page 544. On remand, the District Court granted the government's mo-

tion for summary judgment and entered a decree. The government appealed to the Supreme Court in an effort to have the provisions of the decree enlarged. United States v. United States Gypsum Co., 1950, 340 U.S. 76, 71 S.Ct. 160, 95 L.Ed. 89. The Supreme Court emphasized that its former decision in the Gypsum case was based "squarely on the basis" that defendants constituted "*all*" former competitors in an entire industry." 340 U.S. at page 84, 71 S.Ct. at page 167. Emphasis supplied. The situation *sub judice* was expressly reserved:

"It was not necessary to reach the issue as to whether a mere plurality of licenses, each containing a price-fixing provision, violates the Sherman Act. It is not necessary now." 340 U.S. at page 85, 71 S.Ct. at page 167.

The same question was in like manner reserved in Katzinger Co. v. Chicago Metalic Manufacturing Co., 1947, 329 U.S. 394, at page 398, 67 S.Ct. 416, 91 L.Ed. 374.

The extent of price control which a patentee may exercise over its licensees was recently re-examined by the Supreme Court in United States v. New Wrinkle, Inc., 1952, 342 U.S. 371, 72 S.Ct. 350. There two competitors who had been engaged in litigation as to basic patent rights on wrinkle finish paints, varnishes, and enamels, assigned their patents to a newly organized corporation in exchange for stock in the new company, New Wrinkle, Inc. The patent-holding corporation proceeded to license manufacturers of the wrinkle finishes, obligating the licensees to adhere to a schedule of minimum prices, discounts, and selling terms established by the licensor. "Substantially all" manufactures of wrinkle finishes were tied to such license agreements, in number over two hundred. See 342 U.S. at page 374, 72 S.Ct. 350. The government brought suit against New Wrinkle, Inc., charging violation of Section 4 of the Sherman Act. The District Court entered a motion of dismissal against the government. The Supreme Court reversed:

"We see no material difference between the situation in *Line Material* and *Gypsum* and the case presented by the allegations of this complaint.

An arrangement was made between patent holders to pool their patents and fix prices on the products for themselves and their licensees. The purpose and result plainly violate the Sherman Act. The judgment below must be *reversed*." 342 U.S. at page 380, 72 S.Ct. at page 354.

It is pertinent that the opinion was without dissent; one justice did not take part in the consideration of the case.

It is not clear to what extent the facts of the New Wrinkle case paralleled the Line Material case. In Line Material the patentees pooled competitive, *non-infringing* patents. The Patent Office had awarded dominant claims to one patentee and subservient claims to the other, and "Only when both patents could be lawfully used by a single maker could the * * * patentees obtain the full benefit of the * * * inventions." 333 U.S. at page 291, 68 S.Ct. at page 553, 92 L.Ed. 701. In New Wrinkle, however, the assignors each claimed control of the dominant patents for wrinkle finish paints. Their contentions were never resolved. If the new wrinkle patents were *infringing* patents there would not be cross licensing of the Line Material type, yet the Supreme Court held that the licensing engaged in by New Wrinkle, Inc., violated the anti-trust laws. It must be assumed that in net effect New Wrinkle was meant as an extension of the Gypsum case. Whereas, in the Gypsum case restrictive license agreements tying "all" manufactures in an industry were declared to be violative of the Sherman Act, in the New Wrinkle case agreements tying only "substantially all" were declared illegal.

■ The facts of this case are one step beyond New Wrinkle. Here one holder of a patent licenses two competitors, incorporating a minimum price agreement, thus setting the prices for what constitutes a bare majority of the manufacturers in an industry. This practice has not been declared either legal or illegal since the General Electric case, but each prior step considered by the Supreme Court has served as a basis for further restricting the General Electric doctrine.

In arriving at a decision, this court is governed by the premise that patent grants are strictly construed and the premise that when a patentee ties something else to his invention, he is subject to all the limitations upon that right which the general law imposes upon such contracts. Mercoid case, supra. These premises serve as guide-posts which further strengthen my conviction that the developing law has reached that point at which the practice being engaged in by this plaintiff must be declared as violating the anti-trust laws.

I am of the opinion that the patent laws were never intended to empower the patentee to control the prices to be charged by its licensed competitors. Such a practice flies in the very face of the philosophy of the anti-trust laws and the system of free enterprise which seeks to guarantee the right freely to enter an industry and freely to compete.

A dismissal of the complaint in this case will not in one whit impair the protection intended by the patent grant. Plaintiff may still charge its licensees royalty fees for the use of the process. Plaintiff is still free, furthermore, to bring a suit for infringement. The dismissal will, however, force plaintiff first to renegotiate the license agreements, excluding from them the minimum price clauses. As a practical result, the price which plaintiff and its licensees charge for moire processing will be determined by the competitive forces in the market place rather than predetermined at the design of the plaintiff.

The first cause of action alleged in the complaint is hereby dismissed but without prejudice to renewal upon plaintiff's renegotiating his license agreements, omitting those clauses incompatible with the anti-trust laws. The second cause of action which is based upon alleged trade mark infringement still stands.

There also remains for disposition defendant's counter-claim under 28 U.S.C. § 2201, for a declaration that plaintiff's patent is invalid and for an accounting for damages and for breach of contract.

An order may be submitted in conformity with the opinion herein expressed.