**NEW WRINKLE, Inc., Plaintiff-Appellant,**

v.

**JOHN L. ARMITAGE & CO., Defendant-Appellee.**

**No. 11981.**

United States Court of Appeals Third Circuit.

Argued Nov. 8, 1956.

Decided Nov. 30, 1956.

William H. Pavitt, Jr., Dayton, Ohio, Toulmin & Toulmin, Harry A. Toulmin, Jr., Dayton, Ohio (McCarter, English & Studer, Ward J. Herbert, Newark, N. J., on the brief), for appellant.

Thomas Cifelli, Jr., Newark, N. J., (Richards & Cifelli, Newark, N. J., on the brief), for appellee.

Before MARIS and KALODNER, Circuit Judges, and WORTENDYKE, District Judge.

WORTENDYKE, District Judge.

This is an appeal from a summary judgment of the District Court for defendant-appellee, hereinafter called Licensee, in a declaratory judgment action brought for the construction of a patent license agreement and for other affirmative relief. Jurisdiction rests upon the diversity of citizenship of the parties to this action, which involves an amount in excess of the minimum prescribed by 28 U.S.C.A. § 1332. The jurisdictional foundation also includes the provisions of § 2201 of the same Title.

The motion which resulted in the judgment appealed from derives its authorization from Rule 56(b) of the Rules of Civil Procedure, 28 U.S.C.A.

A copy of the license agreement is annexed to the complaint as Exhibit A. The allegations of justiciable controversy are to be found in paragraph 9 of the complaint, which charges that a composition manufactured and sold by defendant-licensee under the trade mark "Armorhide" is known in the trade as a "wrinkle finish" and is therefore within the category "wrinkle finish composition" upon which plaintiff-licensor contends that licensee is obligated to pay royalties at the rate of five (5¢) cents per gallon as provided in paragraph 2 of the license agreement. The same paragraph of the complaint refers to Exhibits D–1 and D–2 thereto annexed which are, respectively, letters from the licensee's attorney to the attorneys for the licensor framing the assertion and denial that the royalties referred to in the license agreement are payable to the licensor upon the Armorhide finishes manufactured by the licensee.

The issue presented upon licensee's motion for summary judgment below is whether the license agreement required the licensee to pay the royalty provided for upon every gallon of wrinkle finish composition sold or used by the licensee, irrespective of whether such wrinkle finish composition embodied the subject matter of any of the licensed patents acquired before or after execution of the license agreement. These patents are enumerated in Exhibit 1 attached to the license agreement and Exhibit B annexed to the complaint. Licensor would limit to paragraph 2 of the license agreement the definition of the composition upon which the licensee became liable for the payment of the royalty prescribed; while licensee contends that paragraph 3 of the agreement modifies and must be read in conjunction with the provisions of paragraph 2 thereof, with resultant limitation of the royalties to the gallons of wrinkle finish composition "embodying the patented subject matter" of the agreement.

To determine the issue here involved, we must look to the license agreement as a whole and to paragraphs 2 and 3 in particular. Those paragraphs read as follows:

"2. The Licensee hereby agrees to accept said license and to pay therefor a royalty of five (5) cents per gallon of wrinkle finish composition sold or used by it during the term of this agreement.

"3. The Licensee agrees to pay said royalty between the first and twentieth day of each month for the gallons sold during the preceding month embodying the patented subject matter of this contract. This remittance shall be accompanied by a statement of the number of gallons sold, and books of account shall be kept open to inspection during reasonable business hours by the Licensor or its duly authorized representative, but the inspection of said books of account may, at the option of the Licensee, be by a certified public accountant, under instructions not to reveal anything about the confidential business or names of customers of the Licensee."

It appears that the license agreement in suit is embodied in a printed form which had been framed and adopted, and, for some time prior to its date, used by the licensor. The above-quoted excerpt from the document is illuminated by a background of recitals and statements of undertaking therein which is intimately related to the quoted language. At the outset the agreement recites that the licensor (New Wrinkle) is the owner of the patents listed on the attached Exhibit 1, and that the licensee (Armitage) "is desirous of acquiring a license thereunder". Following the recital of a valuable consideration, the language discloses the grant by the licensor to the licensee of "a non-exclusive, personal and indivisible license * * * to make, use and sell the subject matter of the patents shown on the attached Exhibit '1', and of such other patents related to the irregular finish known in the trade as 'Wrinkle Finish' (also known as 'Crinkle', 'Shrivel', 'Sag', 'Morocco', and by other designations), as Licensor may

now or hereafter during the existence of this license own or acquire, for all purposes and uses except, however, for use with fabric of woven cloth or of felt or paper as to which no license is granted hereby." Passing immediately to the next succeeding paragraph (numbered 2, above quoted), it will be noted that the licensee agrees "to accept said license and to pay therefor" a gallonage royalty. Significant in the last quoted phrase are the words "said license". While the word "said" is all too frequently used in legal documents, and therefore much over-worked, it serves in many instances, particularly in the present one, as an essential link in the chain of connection between terms. What, therefore, is "said license" to which paragraph 2 of the agreement refers? The answer to this question is obvious because "said" can only relate back to the preceding paragraph of the agreement from which emerges the phrase "a nonexclusive, personal and indivisible license * * * to make, use and sell the subject matter of the patents shown on the attached Exhibit '1', and of such other patents * * * as Licensor may now or hereafter * * * own or acquire, * * *". In sum, therefore, the licensor grants a license to the licensee under specific patents, and this license, by the language of paragraph 2, the licensee agrees to accept, and for it to pay the royalty of five cents per gallon of the composition sold or used by it during the life of the agreement. Licensor, however, would have us construe the phrase "wrinkle finish composition sold or used by it during the term of this agreement" as unrelated to any of the patents referred to in the agreement or under which the license was granted. Licensor therefore contends that the licensee became liable to pay the designated royalty to the licensor upon every gallon of wrinkle finish composition which the licensee might sell or use, whether or not it was covered by any of the patents which constituted the subject matter of the license. Such a construction of the intent of the language of paragraph 2 of the license agreement seems utterly at variance with the obvious object which the parties sought to achieve and flies completely in the face of the situation disclosed by the recitals and by the express language in which the grant of the license is couched.

Despite licensor's contention that paragraph 2 should be interpreted in isolation from the rest of the license, we find that there is a necessary and indissoluble connection between paragraph 2 and the rest of the license.

With respect to the licensor's contention, limited as it is to the language of paragraph 2 of the agreement, although the licensee agreed to pay five cents on each gallon of wrinkle free composition which it sold or used during the "ten-year" term of the agreement, there is no provision in that paragraph respecting the time of payment, method of determining gallonage, or prescription of the means whereby proper performance by the licensee of its obligation to the licensor might be effectively discerned. While we note in the language of paragraph 3 detailed provisions respecting times of payment and method of determining gallonage, those provisions relate only to royalty upon "gallons sold * * embodying the patented subject matter of this contract". Therefore, according to the argument advanced by the licensor these detailed instructions in paragraph 3 cannot help the licensee to determine when he is to make the payment called for by the provisions of paragraph 2 for the reason (advanced by the licensor) that the two quoted paragraphs are independent rather than interdependent, as maintained by the licensee.

We cannot concur in the licensor's contention that the language of the license agreement permits an inference that the royalty provided for became payable upon any "wrinkle finish composition" which did not embody the patented subject matter of the license agreement. Not only is there an utter absence of ambiguity between paragraphs 2 and 3 of the agreement, but their language is so clearly interrelated that without either of the paragraphs the effectiveness of

the license agreement would be destroyed. It is elementary that a written contract is to be construed so as to give effect to all of its parts, and any construction which would render the agreement meaningless should be avoided. In achieving these objectives, the language used must be accorded a reasonable meaning. While a construction most strongly against the party preparing the written agreement is appropriately adopted where the language is ambiguous, the absence of ambiguity upon the face of the agreement obviates the necessity and propriety of any construction which would depart from the clear meaning of the language used. Where there is no ambiguity, therefore, the Court may not look beyond the language employed by the parties, and the motion for summary judgment here under review appropriately called upon the Court to interpret that language.

■ Emphasis of the exclusiveness of the royalty impact upon patent-covered compositions sold or used by the licensee is to be found throughout the entire written license agreement. Paragraph 1 relates the license to the patents. Paragraph 4 requires the licensee to mark its advertising and containers with notices that the product is patented and licensed by the licensor. Paragraph 5 imposes the penalty of risk of termination for failure of the licensee to give access to its books for the purposes provided for in paragraph 3, which admittedly relates the royalty payments to gallonage of the patented subject matter of the contract. In paragraph 6 the licensee agrees not to contest the validity of the patents referred to in the agreement, and paragraph 10 refers to the patents covered thereby. The provisions of paragraph 7 relate to a schedule of minimum prices which the licensor may establish; again with respect to products of the licensee "covered by patents included herein". Only, therefore, by taking the provisions of paragraph 2 out of the setting of the balance of the contract is any possible justification to be found for licensor's contention that the royalty became applicable to gallonage

of nonpatented compositions. But to do so would be contrary to one of the basic canons of contract construction, which is that the Court must look to the whole instrument, and ascertain the intention of the parties by an examination of all that they have said, rather than of a part only. Black v. United States, 1875, 91 U.S. 267, 23 L.Ed. 324; Specialties Development Corp. v. C-O-Two Fire Equipment Co., D.C., 109 F.Supp. 732, affirmed 207 F.2d 753, 1953, certiorari denied 347 U.S. 919, 74 S.Ct. 519, 98 L. Ed. 1074.

■ Since the language of paragraphs 2 and 3 of the license agreement is so obviously related as to require that they be read together, and since no ambiguity between the provisions of these respective paragraphs is discoverable, the motion for summary judgment rested squarely upon the obvious absence of any genuine issue of fact and called upon the learned trial Court not to construe the meaning of the unambiguous language upon which the justiciable controversy pleaded in the complaint arose, but to decide that controversy upon the provisions of the contract sued upon without the necessity or propriety of considering any extraneous matter, whether issuable or not.

We do not accept the contention of appellant that the Supreme Court in United States v. New Wrinkle, Inc., 1952, 342 U.S. 371, 72 S.Ct. 350, 96 L.Ed. 417, construed the language of the license agreement sub judice in a manner at variance with the construction accorded the critical language by the Court below. The cited case was a civil proceeding under Section 4 of the Sherman Act, 15 U.S.C.A. § 4. The defendant therein, New Wrinkle, had moved the trial Court for a dismissal on the ground that it was not and had never been engaged in interstate commerce, and, therefore, could not be guilty of a violation of the Sherman Act. The District Court granted the motion and entered judgment accordingly, and a direct appeal was taken to the Supreme Court under 15 U.S.C.A. § 29, where a reversal resulted. Appellant

here relies heavily upon a portion of the language of the Supreme Court's opinion by Mr. Justice Reed, 342 U.S. at page 375, 72 S.Ct. at page 352, where, in reviewing the license agreements prepared and used by New Wrinkle, it is said:

"A 5-cent per gallon royalty was made payable on all wrinkle finish sold or used by a licensee, said royalty to be reduced to the same figure as that contained in any subsequent license granted at a lower royalty charge."

We find no indication, either in the last quoted language or elsewhere in Justice Reed's opinion, from which it may be inferred that he either did or intended to construe paragraph 2 of the agreement with which we are presently concerned. The sole issue with which the Supreme Court was confronted in that case was whether an arrangement made between patent holders to pool their patents and fix prices on the products for themselves and their licensees was violative of the Sherman Act. This question the Supreme Court answered in the affirmative.

Automatic Radio Mfg. Co. v. Hazeltine Research, 1949, 339 U.S. 827, 70 S. Ct. 894, 94 L.Ed. 1312, lacks support for appellant's contention here for the reason that no interpretation was made of the language of the license agreement there considered respecting the impact of the royalty payment obligation upon products of the licensee not covered by the license patents. As was stated by Mr. Justice Minton, speaking for the Supreme Court, 339 U.S. at page 830, 70 S.Ct. at page 896:

"The questions for determination are whether a misuse of patents has been shown, and whether petitioner may contest the validity of the license patents, in order to avoid its obligation to pay royalties under the agreement."

The case at bar does not present any question as to the legality of the contract language construed below.

Having concluded that there was no genuine issue as to any material fact upon the motion for summary judgment below, and that the license agreement in suit unambiguously provided that the royalties prescribed should be paid only on wrinkle finish compositions embodying the patented subject matter of the agreement, we consider irrelevant the remaining question which appellant posed as involved on this appeal, namely, whether the agreement might lawfully provide that the royalty be based upon all of the compositions sold or used by the licensee irrespective of whether covered by one or more of the license patents. The lawfulness of the provisions relied upon by the respective parties to the issue presented by the motion below was neither questioned nor discussed.

The judgment of the District Court will be affirmed.