LUCASARTS ENTERTAINMENT
COMPANY, Plaintiff,

v.

HUMONGOUS ENTERTAINMENT
COMPANY, a Washington
corporation, Defendant.

No. C–92–4410–VRW [ENE].

United States District Court,
N.D. California.

Sept. 1, 1993.

William S. Coats, David M. Shannon, Heather D. Rafter, Gibson, Dunn & Crutcher, San Francisco, CA, James M. Kennedy, San Rafael, CA, for plaintiff LucasArts Entertainment Co.

David M. Furbush, Amy J. Winn, Brobeck, Phleger & Harrison, Palo Alto, CA, for defendant Humongous Entertainment Co.

David W. Slaby, Mark S. Ostrau, Fenwick & West, Palo Alto, CA, Ruth A. Kennedy, Electronic Arts, Inc., San Mateo, CA, for intervenor-defendant Electronic Arts, Inc.

## ORDER.

WALKER, District Judge.

This suit arises as a result of an agreement between Electronic Arts, Inc. ("Electronic Arts") and defendant Humongous Entertainment Company ("Humongous"), granting Electronic Arts the right to distribute Humongous' products, including a computer video game entitled *Putt Putt Joins the Parade*. Humongous' principals are former employees of plaintiff LucasArts Entertainment Company ("LucasArts"), who created a software tool called the Script Creation Utility for Maniac Mansion ("SCUMM") System. The SCUMM System is a tool used in the development of computer video games. LucasArts subsequently licensed the SCUMM System to Humongous under limited terms and conditions. Among other things, the license agreement states that Humongous may not sell its games which utilize the SCUMM program to any third party distributor other than LucasArts for less than a certain price and that Humongous must verify its compliance with the licensing agreement at LucasArts' request. The precise language as outlined in section A.1.1.1(b) of the license agreement is as follows:

> For a period of three (3) years commencing on the Effective Date, [Humongous] may not sell any product it develops using the SCUMM System to any third party distributors in North America other than [LucasArts] for less than seventy-five percent (75%) of the six month rolling average wholesale price, net of any promotional allowances, at which such products are resold to North American retailers (current examples of which include Software, Etc.; Babbages; and Electronic Boutique). [LucasArts] reserves the right to verify such wholesale price upon [LucasArts'] request in writing to Licensee. After such three year period, the foregoing price restriction will be inapplicable.

LucasArts brings this suit alleging, among other things, that Humongous violated the terms of the licensing agreement by (1) failing to follow the terms of the price restriction provision and (2) allowing a third party (i.e., Electronic Arts) to publish *Putt Putt Joins the Parade*. Humongous and Electronic Arts deny such allegations and bring counterclaims for violation of federal and state antitrust laws, intentional interference with contractual relations, intentional interference with prospective economic advantage, and unfair competition.

Humongous now moves to amend its counterclaim to add a count for breach of contract and to add factual matter to its claim for interference with prospective economic advantage. In addition, Electronic Arts moves for partial summary judgment on its antitrust claims on the grounds that: (1) the price restriction in section A.1.1.1(b) of the Licensing Agreement between LucasArts and Humongous is *per se* illegal and unenforceable; (2) the restriction constitutes a *per se* illegal and unenforceable boycott; and (3) LucasArts' enforcement of section A.1.1.1(b) constitutes copyright misuse preventing enforcement of LucasArts' copyright. Finally, LucasArts moves for summary judgment on each of the claims set forth in

288

Electronic Arts' and Humongous' counterclaim.

Having reviewed the papers submitted and considered the oral arguments of counsel at a hearing on June 3, 1993, the court hereby: (1) **GRANTS** Humongous' motion to amend its counterclaim; (2) **DENIES** Electronic Arts' motion for partial summary judgment on its antitrust counterclaims; and (3) **GRANTS** LucasArts' motions for summary judgment on Electronic Arts' and Humongous' counterclaims.

## I

█ Humongous seeks to amend its counterclaim to add a count for breach of contract and to add factual matter to its claim for interference with prospective economic advantage pursuant to FRCP 15(a), or, in the alternative, FRCP 13(f).

FRCP 15(a) provides that leave to amend "shall be freely given when justice so requires." The Ninth Circuit has interpreted FRCP 15(a) with "extreme liberality," *United States v. Webb*, 655 F.2d 977, 979 (9th Cir.1981), and the burden of showing why leave should *not* be granted rests with the non-moving party, *Genentech, Inc. v. Abbott Laboratories*, 127 F.R.D. 529, 530–31 (N.D.Cal.1989).

The court finds that allowing Humongous to amend its counterclaim to add a count for breach of contract will not affect the pending summary judgment motions and will work no prejudice against LucasArts. Similarly, allowing Humongous to amend its interference with prospective economic advantage claim to add factual matter inadvertently omitted will prevent re-litigation of issues relevant to LucasArts' summary judgment motion, increase judicial efficiency and serve the ends of justice.

The factual allegations concerning LucasArts' bad faith behavior which Humongous wants to add were already described in the third and fourth affirmative defenses in Humongous' answer to the amended complaint. Thus, the amendment would not raise new facts and should not surprise LucasArts in any way. The amendment would simply permit Humongous to correct the pleading by incorporating the allegations of the affirmative defenses into the counterclaim. For the foregoing reasons, the court hereby **GRANTS** Humongous' motion to amend its counterclaim pursuant to FRCP 15(a).

## II

In addition, Electronic Arts moves for partial summary judgment on its antitrust counterclaims, which allege that section A.1.1.1(b) constitutes an illegal price fixing agreement and an illegal boycott in violation of the Sherman and Cartwright Acts. Further, Electronic Arts contends that LucasArts' enforcement of section A.1.1.1(b) constitutes copyright misuse, thereby preventing enforcement of LucasArts' copyright.

### A

█ In support of its argument that section A.1.1.1(b) constitutes a *per se* illegal price fixing agreement, Electronic Arts cites some of the antitrust laws' greatest hits: *United States v. Socony–Vacuum Oil Company*, 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940); *United States v. New Wrinkle, Inc.*, 342 U.S. 371, 377, 72 S.Ct. 350, 353, 96 L.Ed. 417 (1952) ("[P]rice fixing in commerce, reasonable or unreasonable, has been considered a *per se* violation of the Sherman Act."); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (certain practices, including price fixing, "are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use"); *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 351, 102 S.Ct. 2466, 2476–77, 73 L.Ed.2d 48 (1982) (the anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some).

LucasArts correctly notes that none of these cases involve intellectual property rights of the type here and citation to these cases merely begs the principle question in this case; namely, whether section A.1.1.1(b) falls outside the safe harbor accorded to intellectual property owners by the Supreme Court in *United States v. General Electric*,

272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926).

In *General Electric,* the Supreme Court held that the statutory right of intellectual property owners to forbid entirely sales by licensees necessarily includes the power to restrict the prices at which such licensees may sell licensed material:

> The patentee may make and grant a license to another to make and use the patented articles but withhold his right to sell them * * *. [If the licensee] sells [the patented articles,] he infringes the right of the patentee, and may be held for damages and enjoined. If the patentee goes further, and licenses the selling of the articles, may he limit the selling by limiting the method of sale and the price? *We think he may do so provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly * * *.* It would seem entirely reasonable that he should say to the licensee, "Yes, you may make and sell articles under my patent but not so as to destroy the profit that I wish to obtain by making them and selling them myself."

*Id.* at 490, 47 S.Ct. at 197.

Applying the foregoing principle to the case at bar, the court finds that the price restriction found in section A.1.1.1(b) of the Licensing Agreement does not violate the Sherman or Cartwright Acts because it is "reasonably adapted to secure pecuniary reward for the [LucasArts' lawful] monopoly."

■ In any event, the *per se* rule is reserved only where experience has demonstrated that anticompetitive effects predictably and regularly flow from a particular practice, *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.,* 890 F.2d 139, 151 (9th Cir.1989), or where the potential harm to competition is "so clear and so great," *Bhan v. NME Hospitals, Inc.,* 929 F.2d 1404 (9th Cir.1991), or where the challenged activity would almost always tend to have a predominantly anticompetitive effect, *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). The present case involves a licensing provision which is

plainly procompetitive, namely the licensing of SCUMM code to Humongous so that Humongous can create more computer video games. There can be no serious question that such licensing activities foster consumer welfare.

Limitations imposed by the antitrust laws are thought to improve consumer welfare because they force firms to *increase* output from monopolistic to competitive levels. This is based upon the notion that firms face increasing marginal costs (i.e., the laws of diminishing returns). If returns to scale are increasing, however (i.e., falling marginal costs), the competitive model upon which the antitrust laws are premised is stood on its head and "the role of imperfect competition plays." Paul A. Samuelson and William D. Nordhaus, *Economics* at 547–548 (13th ed 1989). Where "imperfect competition" provides the economic standard, the antitrust laws' restrictions against extension of monopoly should not apply. Here, the high initial costs of programming code compared to the relatively low cost of producing copies of the code, make application of traditional antitrust concepts inappropriate. In such a setting, marginal costs decline with increases in production rather than the other way around, the situation to which the antitrust laws apply. As such, the application of the *per se* rule in judging the legality of the license agreement does not comport with the principles underlying the establishment of the *per se* rule.

### B

■ Even if the foregoing were not true, section A.1.1.1(b) runs afoul of the antitrust laws only if it forecloses Electronic Arts from competition. It does not.

Electronic Arts relies on *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (9th Cir.1985), correctly reading that decision as barring unreasonable concerted refusals to deal or group boycotts. In this case, however, the court finds nothing unreasonable in LucasArts, a holder of a valid copyright in the SCUMM System Code, imposing on its licensee resale price

restrictions on the copyrighted material or material derived therefrom. Such conduct in no way forecloses Electronic Arts from offering competing copyrighted material if it produces such material or licenses it from others. In short, competition can suffer no injury from section A.1.1.1(b).

Finally, the court notes that the essence of a copyright interest is the power to exclude use of the copyrighted work by those who did not originate it or who are not authorized to use it. The right to license a patent or copyright (and to dictate the terms of such a license) is the "untrammeled right" of the intellectual property owner. *United States v. Westinghouse Electric Corp.*, 648 F.2d 642, 647 (9th Cir.1981) (quoting *Cataphote Corp. v. DeSoto Chemical Coatings, Inc.*, 450 F.2d 769, 774 (9th Cir.1971)). In *Simpson v. Union Oil Co.*, 377 U.S. 13, 24, 84 S.Ct. 1051, 1058, 12 L.Ed.2d 98 (1964), the Supreme Court noted that the laws of intellectual property "are in *pari materia* with the antitrust laws and modify them *pro tanto.*" Accordingly, a court must tread gingerly before permitting an antitrust plaintiff to modify the scope of the statutory copyright grant that Congress has seen fit to impose. Applying the foregoing considerations to the present case, the court declines to find anything unreasonable or illegal in the resale price restriction found in section A.1.1.1(b).

### C

■ Electronic Arts also argues that LucasArts cannot enforce its copyright in the SCUMM System because LucasArts is guilty of copyright misuse. According to Electronic Arts, LucasArts has attempted to extend its copyright in the SCUMM code beyond the scope granted by the Copyright Act.

Part of the SCUMM code, namely the SCUMM engine, must actually be embedded in the computer video game in order for the game to work. In this case, Humongous' *Putt Putt Joins the Parade* does have the SCUMM engine embedded in its program. Electronic Arts does not dispute that LucasArts owns all rights to the SCUMM System. Electronic Arts does, however, object to LucasArts' use of its ownership rights in the

SCUMM engine to control the price at which Humongous can sell *Putt Putt.*

The court finds no basis for a claim of copyright misuse. LucasArts only seeks to control rights over its SCUMM System; it does not seek control over materials in which it does not own a copyright. What makes things difficult for Electronic Arts and Humongous is that part of the SCUMM code happens to be embedded in *Putt Putt,* and it is difficult, if not impossible, for LucasArts to retain control over its copyrighted work without also asserting some control over Humongous' work. Nevertheless, LucasArts holds a valid copyright in the SCUMM System, including the SCUMM engine, and it has not misused its copyright in asserting control over Humongous' *Putt Putt Joins the Parade.*

In sum, the court concludes that: (1) the price restriction in section A.1.1.1(b) of the Licensing Agreement between LucasArts and Humongous is not *per se* illegal and unenforceable; (2) the restriction does not constitute an illegal and unenforceable boycott; and (3) LucasArts' enforcement of section A.1.1.1(b) does not constitute copyright misuse, thereby preventing enforcement of LucasArts' copyright. Accordingly, the court **DENIES** Electronic Arts' motion for partial summary judgment on its counterclaims for price fixing and boycott under §§ 1 and 2 of the Sherman Act and the California Cartwright Act and **GRANTS** LucasArts' motion for summary judgment on its antitrust counterclaims.

If there is no antitrust violation, then section A.1.1.1(b) is valid, and LucasArts' claims of copyright infringement, breach of contract, and rescission, as well as LucasArts' counterclaims for intentional interference with contractual relationship and with prospective economic advantage, still remain. Accordingly, the court **DENIES** Electronic Arts' motion for partial summary judgment on these claims.

### III

■ In order to state a claim for tortious interference with prospective economic advantage, plaintiff must show: (1) an economic relationship containing the probability of future economic benefit to the plaintiff; (2)

defendant's knowledge of the existence of the business relationship; (3) defendant's intentional commission of acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately resulting therefrom. See *PG & E v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 n. 2, 270 Cal.Rptr. 1, 791 P.2d 587 (1990).

■ The elements of a cause of action for intentional interference with contractual relations are: (1) a valid and existing contract; (2) defendant's knowledge of the contract; (3) defendant's intent to induce a breach of that contract; (4) actual breach of the contract by the contracting party; (5) causation; and (6) damages. See generally, *PG & E*, 50 Cal.3d at 1126, 270 Cal.Rptr. 1, 791 P.2d 587.

LucasArts moves for summary judgment on Electronic Arts' and Humongous' counterclaim for intentional interference with contractual relationship and with prospective economic advantage on the grounds that: (1) there is no evidence that LucasArts had a wrongful intent to disrupt any existing or potential relationship; (2) there is no evidence of any actual disruption; (3) LucasArts' mere filing of this lawsuit will not support these claims; and (4) LucasArts' actions were privileged under the First Amendment of the United States Constitution and under California Civil Code Section 47.

### A

■ Electronic Arts and Humongous base their claim of wrongful intent on the issuance of a press release concerning the filing of the instant lawsuit. According to Electronic Arts, the press release was faxed directly to selected retail buyers of *Putt Putt* and intended to chill sales of the video game. Not only does Electronic Arts object to whom the press release was sent, it also objects to the timing of the release, only one day after Humongous first released *Putt Putt*.

The court finds no evidence of wrongful intent on the part of LucasArts in issuing the press release. As explained by Gordon Radley, LucasArts' Chief Operating Officer, LucasArts customarily issues press releases whenever a significant corporate event occurs to parties who may be interested. See ¶ 3 of declaration of Gordon Radley. More-

over, the press release concerning the instant litigation with Humongous was drafted and disseminated in accordance with LucasArts' standard procedures. Id. Finally, the mere filing of this lawsuit cannot support a finding of intentional interference. In *PG & E v. Bear Stearns & Co.*, 50 Cal.3d 1118, 270 Cal.Rptr. 1, 791 P.2d 587 (1990), the California Supreme Court held that claims for intentional interference with contractual relations or prospective economic advantage cannot be based upon the initiation of a lawsuit, unless the lawsuit is baseless and there has been a termination of the underlying lawsuit in the plaintiff's favor. In the present case, the lawsuit does not appear baseless and is, of course, ongoing.

In short, LucasArts claims, and the court agrees, that the issuance of the press release in no way evidences an intent to disrupt any existing or prospective relationship between Humongous and Electronic Arts. Id. at ¶ 4. Accordingly, the court **GRANTS** LucasArts' motion for summary judgment on Electronic Arts' tortious interference claims.

Even if LucasArts has shown the requisite intent, LucasArts contends that there is no evidence of any actual disruption of an existing contract or a prospective advantage. Humongous, on the other hand, responds that it suffered specific damages as a result of LucasArts' actions, including loss of time, money, goodwill, reputation and business opportunity. Humongous, however, fails to substantiate these claims with any supporting declarations, despite the fact that one Electronic Arts' counsel has spoken to persons with knowledge of the press release who would be in a position to offer such supporting declarations if indeed true. Moreover, Humongous has yet to produce any evidence that the press release resulted in even a single loss in sale of *Putt Putt*. Thus, in the alternative, the court **GRANTS** LucasArts' motion for summary judgment on the interference claims on the ground that Electronic Arts has failed to show any evidence of actual disruption.

IT IS SO ORDERED.